

**FILED**

MAR 0 7 2011

CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| GARY HOUSEWEART, | * | CIV. 09-4168 |
| | * | |
| Plaintiff, | * | |
| | * | |
| -vs- | * | REPORT   and   RECOMMENDATION |
| | * | |
| | * | |
| MICHAEL J. ASTRUE, Commissioner, | * | |
| Social Security Administration, | * | |
| | * | |
| Defendant. | * | |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Plaintiff seeks judicial review of the Commissioner's final decision denying him a period of disability commencing on December 1, 2005, and payment of disability insurance and medical benefits under Title II of the Social Security Act.[1]  The Plaintiff has filed a Complaint  and has requested the Court to enter an order instructing the Commissioner to award benefits.  Alternatively, the Plaintiff requests a remand to the agency pursuant to 42 U.S.C. § 405(g) sentence four, for further consideration.  The matter is fully briefed and has been referred to the Magistrate Judge for a Report and Recommendation.  For the reasons more fully explained below, it is respectfully recommended

---

[1]SSI benefits are sometimes called "Title XVI" benefits, and SSD/DIB benefits are sometimes called "Title II benefits." Receipt of both forms of benefits is dependent upon whether the claimant is disabled.   The definition of disability is the same under both Titles.  The difference –greatly simplified--is that a claimant's entitlement to SSD/DIB benefits is dependent upon her "coverage" status (calculated according to her earning history), and the amount of benefits are likewise calculated according to a formula using the claimant's earning history. There are no such "coverage" requirements for SSI benefits, but the potential amount of SSI benefits is uniform and set by statute, dependent upon the claimant's financial situation, and reduced by the claimant's earnings, if any.

In this case, the Plaintiff filed his  application for SSD/DIB  benefits only.  He filed his application on April 24, 2007.  AR 97-103.  Mr. Houseweart's "date last insured" for SSD/DIB ("Title II") benefits is September 30, 2008.  *See* AR 9, 108.

to the District Court that the Commissioner's Decision be REVERSED AND REMANDED for further proceedings.

## JURISDICTION

This appeal of the Commissioner's final decision denying benefits is properly before the District Court pursuant to 42 U.S.C. § 405(g). Judge Piersol referred this matter to the Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(A) and a Standing Order dated November 29, 2006.

## ADMINISTRATIVE PROCEEDINGS

Plaintiff filed his application for benefits on April 24, 2007. AR 97-103. In a form entitled "Disability Report–Adult" he filed in connection with his 2007 disability application (AR 147-153) Plaintiff listed the following as illnesses, injuries or conditions that limited his ability to work: "back pain" AR 148. He explained that this condition limits his ability to work in the following ways: "After being up for about an hour I need to sit or lay down. I am not able to lift over five pounds on a regular basis." *Id.*

Plaintiff's claim was denied initially on May 8, 2007 (AR 60-62), and on reconsideration on October 12, 2007 (AR 69-70). He requested a hearing (AR 57) and a hearing was held by video conference on December 22, 2008, before Administrative Law Judge (ALJ) the Honorable Lyle Olson. AR 17-57. On February 6, 2009, the ALJ issued an eight page, single-spaced decision affirming the previous denials. AR 9-16. On March 20, 2009, Plaintiff's attorney[2] sent a letter to the Appeals Council requesting review of the ALJ's decision. AR 6. The Appeals Council received as additional evidence: (1) Reports from Sanford Clinic from May 14, 2007 through December 20, 2008 and reports from Sioux Valley Clinic from November 16, 2007 through March 27, 2007; (2) Medication list dated November 21, 2005 through November 22, 2005; (3) Resume and report from Thomas Audet; (4) Counsel's brief (AR 5) but nonetheless denied review of Plaintiff's claim on September 21, 2009. AR 1-4. Plaintiff then timely filed his Complaint in the

---

[2]Plaintiff was not represented by Mr. Pfeiffer at the administrative level.

District Court .

## **FACTUAL BACKGROUND**

Gary Houseweart was born in 1953 and was fifty-five  years old at the time of the administrative hearing. AR 21.[3] He is a high school graduate. AR 24.  He attended college for part of one semester. *Id.* He lives in a house with his wife, his daughter-in-law, and his grandson. AR 22, 25, 45.  He obtained HAZMAT training through the Union when he was a heavy equipment operator in the 1980's, but otherwise has no additional education. *Id.* He has no problem with basic reading and math skills. *Id.* He has not worked since his alleged onset date in December, 2005. His last job was as a school custodian.  He left that employment because he "just couldn't do it anymore." AR 25.

Plaintiff asserts he became disabled in December, 2005.   He had surgery on his back in December, 2005  and never returned to work. AR 25, 29.  He receives a small retirement income from his Union job, and he has health insurance through his wife's job at Wal-Mart. AR 22,25.

Plaintiff's past work includes: school custodian, park maintenance worker, heavy equipment operator, appliance delivery man, and department head for a retail plumbing store. AR 26-28.  He does not believe he is presently capable of performing any of those jobs, because his "back is just in too bad a shape." AR 28. Plaintiff explained "I can't stand for a long period of time, I can't squat, pick up anything.  Anything that I try to pick up I just, it just makes my back terrible . . . I can't seem to stay stable long enough to get a job." *Id.*

### **Medical Conditions and Treatment**

The medical records which appear in the administrative records are summarized by provider.

---

[3]Pursuant to 20 C.F.R. Pt. 404 Subpt. P. App. 2, Medical Vocational Guidelines, § 201.00(f), Plaintiff was "of advanced age" (55 and over) on the date of his administrative hearing and on his date last insured.  On the date of his alleged onset, he was a "approaching advanced age" (50-54). *Id.* at § 201.00(g).

1.     **Sierra Surgery and Imaging, Carson City, Nevada (11/05 through 12/05)**

Plaintiff had a pre-surgical physical one month before his back surgery.  AR 266, 284-85.
A chest x-ray revealed a normal sized heart and lungs and several old, healed rib fractures.  AR 266.
Plaintiff was admitted to the hospital on December 1, 2005 with a diagnosis of L4-5 lumbar spinal
stenosis, degenerative disc disease and L4-5 herniated nucleus pulposus.  AR 213.  Dr. Michael Fry
performed a posterior lumbar fusion with instrumentation.  *Id.*  Plaintiff was discharged two days
later when he met all post-operative goals. *Id.*   He was instructed to walk as tolerated, avoid
bending, twisting and lifting activities, and to avoid lifting anything over five pounds.  He was
instructed to avoid sitting or standing for more than 45 minutes without a 5 minute break.  He was
to avoid driving for 3 weeks.  *Id.*  Plaintiff left the hospital with a front wheel walker and a raised
toilet seat and was instructed to return to the doctor the following week.  AR 214.

2.     **Dr. Michael Fry, Carson City Nevada (10/04 -3/06)**

In October, 2004, Dr. Michael Fry  referred Plaintiff for an MRI of the lumbar spine.  AR
317-319.  It revealed foraminal stenosis at the L4-5.  The radiologist recommended a lumbar
myelogram to determine if nerve root compression develops with axial loading.  AR 320.

Plaintiff presented to Dr. Fry on January 17, 2005 explaining he'd been on garbage detail
when he injured his back.  AR 303.  He complained of both back and leg pain.  *Id.*  Dr. Fry's
physical exam produced a mildly tender lumbar spine from the L5 to S1.  AR 304.  Straight leg
rasing was limited to 90 degrees without radicular pain in a sitting position, 70 degrees in a lying
position, which produced pain on both the right and the left.  *Id.*  Plaintiff had good range of motion
in his cervical spine and upper extremities.  AR 305.  He had good strength in all extremities.  AR
304-05.  His x-ray and MRI showed degenerative changes in the spine and foraminal narrowing.  AR
305.  Dr. Fry diagnosed lumbar discogenic back pain, lumbar radiculopathy, and possible peripheral
vascular disease secondary to smoking.  *Id.*  He prescribed Mobic[4] and recommended an epidural
injection.

---

[4]Mobic is a non-steroidal anti-inflammatory indicated for relief of the signs and
symptoms of osteoarthritis.  Www.rxlist.com.

Plaintiff returned to Dr. Fry on March 7, 2005, after the epidural injection. AR 302. The injection helped a little, but Plaintiff continued to have back and leg pain. Dr. Fry recommended another epidural injection and pool therapy. *Id.* Plaintiff was instructed to return in a few months.

Plaintiff returned to Dr. Fry on May 4, 2005. AR 299. Plaintiff indicated he was ready to consider surgery. *Id.* Dr. Fry encouraged Plaintiff to walk as much as tolerable but to avoid long-term sitting and driving. *Id.* Dr. Fry encouraged Plaintiff to think about the surgery for a few months. *Id.* Dr. Fry called in a prescription for Flexeril.[5] AR 300. Dr. Fry instructed Plaintiff not to drive while taking Flexeril. *Id.*

Dr. Fry ordered another lumbar MRI in October, 2005. AR 298. The repeat MRI revealed fairly significant lumbar stenosis, left paracentral at L4-5 and fairly significant degenerative disc disease. AR 297. Based on these findings, Dr. Fry proposed an L4-5 decompressive laminectomy with foraminotomies at L4-5 and L5-S1, with L4-5 bilateral lateral fusion with instrumentation, pedicle screws, rods and iliac crest grafting. Dr. Fry explained the surgery would improve Plaintiff's back pain but not cure it and improve the buttock and leg pain. AR 297. Surgery was scheduled for December 1, 2005. *Id.* Dr. Fry estimated Plaintiff would be off work for up to six weeks. AR 296.

Plaintiff returned to Dr. Fry's office one week after the surgery. AR 295. He reported a backache, but the leg pain was resolved. *Id.* Plaintiff was taking Percocet[6] for pain and Valium[7] for sleep. His motor and neuro exams were intact. He was using the walker for assistance with ambulation. *Id.* Dr. Fry instructed Plaintiff to return in a month and to continue avoiding bending, twisting, and lifting anything over five pounds. *Id.* Plaintiff called Dr. Fry's office a week later to explain he'd accidentally spilled his Percocet into the toilet. AR 294. The physician's assistant

---

[5]Flexeril is a muscle relaxant indicated as an adjunct to rest and physical therapy for relief of muscle spasm associated with acute, painful musculoskeletal conditions. Www.rxlist.com.

[6]Percocet is a semisynthetic opoid analgesic (oxycodone and acetaminophen) which is indicated for the relief of moderate to moderately severe pain. Www.rxlist.com.

[7]Valium is a benzodiazepine derivative. It is indicated for the management of anxiety disorders or the short-term relief of symptoms of anxiety. Www.rxlist.com.

refilled the prescription with a thorough explanation that no more Percocet would be prescribed. *Id.*

Plaintiff reported to Dr. Fry on January 4, 2006. AR 293. He indicated some right leg pain, but no left let pain. *Id.* Plaintiff explained he needed to go back to his job as a janitor at a middle school, but would only be allowed back on the job if he was released with no restrictions. *Id.* Dr. Fry wished to wait two more weeks before deciding whether Plaintiff was ready to return to work. *Id.* Dr. Fry encouraged Plaintiff to try cleaning at home to test his tolerance and advised that a return to a full duty, eight hour workday in two weeks would likely cause Plaintiff to be "very sore." *Id.* Plaintiff was advised to continue to avoid bending, twisting and lifting. *Id.*

Plaintiff returned to Dr. Fry two months post surgery. AR 292. Plaintiff reported his attempt to vacuum at home resulted in severe pain. He did not believe he was ready to return to full-duty work. *Id.* Dr. Fry recommended a re-check in six weeks, while continuing previous physical restrictions, except the lifting was increased to 7-10 pounds. *Id.* Dr. Fry also started Plaintiff on pool therapy in an effort to increase lumbar strength. When Plaintiff returned to Dr. Fry four months post-surgery, (AR 91) he had decreased his Valium and Norco[8] and was taking ibuprofen as needed. *Id.* Dr. Fry released Plaintiff to work without restrictions, and noted Plaintiff planned to move to South Dakota in a few months (June, 2006). Dr. Fry refilled Plaintiff's Norco prescription and planned to see Plaintiff one last time before the move to South Dakota. *Id.*

### 3.   Sanford Clinic Pain Center, Sioux Falls, SD (4/07)

Plaintiff was first seen at the Sanford Clinic Pain Center on April 3, 2007, on a referral from Dr. Hruby. AR 327. His chief complaint was back pain. *Id.* He reported a long history of back pain, beginning in the 1990's. He attributed the pain to his work as a heavy equipment operator, indicating "I think that's what smashed up my discs back there." *Id.*

Plaintiff reported his surgical procedure provided no relief, and therapy caused more pain. *Id.* He did not like the side effects of Oxycodone because it "knocked him out." *Id.* He was

---

[8]Norco is an opoid analgesic which is a blend of Hydrocodone and acetaminophen. It is indicated for the relief of moderate to moderately severe pain. Www.rxlist.com.

currently taking Vicodin, which eased the pain enough to allow him to function. *Id.*   Plaintiff described low back pain which radiated into his legs. He also complained of migraine headaches, but none since his move to South Dakota. AR 327. He described ability to complete activities of daily living, but at a slower pace than before. He indicated bending even enough to brush his teeth elicited back pain. *Id.* He indicated he had not worked since he left his job as a school custodian in Carson City, Nevada in November, 2005. His pain management goal was to reduce pain and improve his quality of life. AR 328. He reported his current medications as: Hyzaar[9], Vicodin, and Ibuprofen. Plaintiff reported a history of alcoholism and past marijuana use. *Id.* The pain clinic personnel possessed and reviewed medical records from Dr. Fry and Dr. Hruby in addition to the pre-operative MRI performed in Carson City, Nevada. AR 328-29. Plaintiff's physical exam revealed normal strength in the lower extremities, but positive straight leg raising at 70 degrees. AR 329. The initial assessment was: low back pain, status post L4-5 fusion; active smoker; piriformis syndrome; depression; high degree of disability; two premature deaths in nuclear family; history of etoh treatment, remote; and obesity/deconditioning. AR 329-330. The therapist referred Plaintiff to physical therapy, recommended smoking cessation, prescribed Oxycodone, sent Plaintiff for a toxicology screen, and provided a controlled substance treatment agreement. AR 330.

Part of Plaintiff's pain management treatment was pain management counseling. AR 330. Plaintiff expressed resistance to the psychologic component of the pain management program. AR 325. Plaintiff related well, however, with the physical therapist. *Id.* On his second visit to the pain management clinic, Plaintiff's toxicology screen was positive for THC (marijuana) use. AR 325. Dr. Hansen explained to Plaintiff that he could not use marijuana and participate in a pain management program which prescribed Schedule II medication. *Id.* Plaintiff was also required to participate in a chemical dependency assessment as a result of the positive THC test. *Id.*

During Plaintiff's next visit with Dr. Hansen, Plaintiff explained that an increase in his Oxycodone dose did not help control his pain. AR 323. Plaintiff preferred Vicodin for pain

---

[9]Hyzaar is a losartan potassium-hydrochlorothiazide, indicated for the treatment of hypertension. Www.rxlist.com.

7

management. AR 323. He expressed continued satisfaction with physical therapy and thought it was helping him to be more functional. Dr. Hansen discontinued the Oxycodone and started Plaintiff on Hydrocodone, which is a generic form of Vicodin. AR 323. When Plaintiff returned to Dr. Hansen on May 9, 2007, Plaintiff reported the Hydrocodone was helping and was much better than Oxycodone. AR 342. Dr. Hansen noted Plaintiff had applied for Social Security and "he is not interested in working as a goal. He would like to fish, hike and swim with his grandson." *Id.* Plaintiff also reported he'd quit THC and had gone to Mt. Rushmore and Crazy Horse the previous weekend. Dr. Hansen noted Plaintiff seemed much more relaxed and "does not have the sense of duress" as when he started the pain management program. *Id.* Plaintiff rated his back pain as a four on a scale of ten. The chemical dependency assessment report was "better than expected." *Id.*

### 4.    Hanson Eastside Physical Therapy, Sioux Falls, SD (4/07-5/09)

Plaintiff received physical therapy from Chad Hanson, PT beginning in April, 2007, on referral from Dr. Hansen at the Sanford Health Pain Clinic. AR 355. Plaintiff reported working in construction driving heavy equipment which "tore up" his back from all the bouncing. *Id.* He reported back and right leg pain. His stated goals were to get some pain relief and to be able to function better. *Id.*   The therapist recommended Plaintiff should avoid lifting anything over ten pounds and avoid pushing, pulling and prolonged sitting. AR 356. Plaintiff continued with physical therapy twice per week with Mr. Hanson. AR 357. At the end of April, 2007, Plaintiff reported having done yard work and as a result "it's a killer today." AR 361. He reported pain as a seven on a scale of ten. *Id.* Plaintiff noted improvement with physical therapy, including the ability to put together a barbeque grill, go fishing, and put his shoes on as compared to before beginning physical therapy. AR 362. The therapist noted Plaintiff "appears to be able to do more activities he enjoys doing." *Id.* At the next visit (May 2, 2007) however, Plaintiff reported that a small amount of yard work "tears me up." AR 363. Cleaning the shed and carrying tools was difficult. *Id.*

Plaintiff reported he took a trip to the Black Hills the first week in May, 2007. He had a "great" weekend except did have discomfort from the long drive. AR 364. At the next visit, Plaintiff reported a setback and indicated his low back muscles were sore and leg symptoms had

returned.  He expressed a desire to regain flexibility.  AR 365.  The therapist advised they "will need to progress at a slower rate with Gary but will be imperative that he regain better control and endurance of the core stabilizers to allow for return to his goal of improved function with less pain." *Id.*

In the middle of May, 2007, Plaintiff discontinued care with Dr. Hansen.  He continued to have physical therapy, however, with Chad Hanson.  AR 366.  At Plaintiff's next physical therapy appointment (May 21, 2007) he requested all further correspondence be directed to his family physician, Dr. Hruby.  AR 367.    Plaintiff reported having a good weekend and having been able to go fishing and work in his garage.  *Id.*  His medication had been adjusted to four Hydrocodone per day.  At the next visit he reported having been to the Palisades Park.  AR 368.  Two days later, however, he reported increased back pain.  AR 368.  He also indicated he'd been trying to back off his pain medication because on days when he took  more than prescribed it caused  him to run out early and he could not refill his medications in advance.  *Id.*  In the middle of June, Plaintiff told his therapist he'd decided he would just have to live with his back pain.  AR 369.  Plaintiff expressed frustration at being unable to engage in activity without  increased pain.  *Id.*  The physical therapist suggested a functional capacity evaluation.  *Id.*  This same suggestion was repeated in mid-July, 2007 when Plaintiff again expressed frustration at his situation.  AR 370.

On July 19, 2007 Plaintiff reported to the physical therapist that Dr. Hruby had prescribed Zoloft[10] and was checking in to scheduling an MRI for his lower back.  AR 371.  Plaintiff continued physical therapy through the fall of 2007.  The MRI and an epidural injection were performed  in October, 2007.  AR 375.  Plaintiff reported to the physical therapist that the epidural did more harm than good.  *Id.*  In November, Plaintiff asked the therapist to progress the exercises in an effort to strengthen his back.  AR 376.  Plaintiff feared he would be unable to return to normal activity or work.  *Id.*

---

[10]Zoloft is a sertraline hydrochloride tablet.  It is an antidepressant indicated for the treatment of major depressive disorder in adults.  Www.rxlist.com.

In the spring of 2008, Plaintiff described to the physical therapist three episodes in which he was in a store with his wife and experienced severe pain in his back and legs. AR 379. At the next session Plaintiff reported he'd been doing more home exercises and had begun a weight loss program. AR 380. On May 1, 2008, Plaintiff reported he'd been trying to be more active around the house and believed that helped his condition. *Id.* He wished to continue physical therapy twice per week but was unable to afford it. *Id.* He reported he did not need narcotics for pain control. *Id.* In June, 2008, Plaintiff articulated his goals to lose 40 pounds and stop smoking. AR 381. At the end of June, 2008, Plaintiff told his therapist he'd adjusted a car mirror and gone fishing in a boat, but these activities had both caused him immediate pain and to be sore ever since. AR 382. He reported his pain level at eight out of ten. *Id.* By the middle of July, his pain level had returned to a four and a half out of ten. *Id.* In September, 2008 Plaintiff reported he had been walking his dog a lot. AR 383. He'd had a rough month and had pain if he walked up the stairs. *Id.* His low back bothered him and his legs hurt, tingled, and were weak. *Id.*

Plaintiff likewise reported "rough" times and increased pain in the fall of 2008. AR 384. Plaintiff did not explain the cause for his increased pain other than the cold weather and a trip to Colorado, Wyoming and the Black Hills in October, 2008. *Id.* , AR 385. In November, 2008, Plaintiff commented that sitting on the floor for ten minutes to play with his grandson caused a flare up of pain. AR 386. On November 20, 2008, the physical therapist noted Plaintiff appeared very depressed and teary.   The therapist took special note of Plaintiff's emotional state and was concerned because he'd never seen Plaintiff like this before. The therapist assured Plaintiff he could call anytime to talk. *Id.* Plaintiff returned at the end of November in better spirits. AR 387. He expressed his fear of having increased pain if he did much around the home. *Id.* At the next visit he explained that helping his son with his car resulted in increased back strain. *Id.*

Plaintiff continued physical therapy through December 2008 and January 2009. AR 487-88. The last physical therapy note available in the record is dated May 7, 2009. AR 490. At that time, Plaintiff reported depression and back pain which he rated a four on a scale of ten. *Id.*

### 5.     Sanford Clinic–Family Medicine (Dr. Hruby) (4/06-3/09)

Plaintiff first presented at the Sanford Family Medicine Clinic on November 16, 2006.  AR 474.  He reported a history of high blood pressure, well controlled with medication.  *Id.*  He also reported a history of chronic pain and back surgery in December, 2005.  He reported regular use of Vicodin and occasional Valium.  AR 474.  Plaintiff was then in the process of establishing treatment with Dr. Hansen at the pain clinic.  *Id.*  Plaintiff reported he needed refills on his medications and that he had a stressful year because of his move to South Dakota and other matters in his personal life.  *Id.*  Dr. Hruby's physical exam revealed a decreased range of motion in the trunk but good strength in the lower extremities and a normal gait.  He assessed high blood pressure which was well controlled, chronic pain, and recent stressors.  Dr. Hruby refilled Plaintiff's Vicodin and referred Plaintiff to the pain clinic/Dr. Hansen.   Dr. Hruby also refilled Plaintiff's blood pressure medications.

Dr. Hruby's notes indicate Plaintiff saw Dr. Hansen on April 9, 2007 and signed a pain control substance agreement.  Plaintiff also was set up for physical therapy.  AR 472.  There is a note in Dr. Hruby's records dated May 14, 2007 indicating a nurse from the pain clinic called to report Plaintiff had been taking more pills than prescribed and was short by 60 pills.  AR 392.  When the nurse explained he needed to follow the pain agreement, he became angry and refused to return to Dr. Hansen's pain clinic.  *Id.*  Dr. Hruby ordered his staff not to refill the Hydrocodone prescription. *Id.*  Plaintiff presented at Dr. Hruby's office on May 23, 2007.  AR 393.  He explained he took "way too many" Lortab[11] pills "simply because they were there."  He described no recent injury but his blood pressure was elevated which he attributed to increased pain.  *Id.*  Dr. Hruby agreed to fill and monitor Plaintiff's medications with the goal to steadily cut down the amount of medication and maintain Plaintiff's level of functioning.  Plaintiff was instructed to get his medications only through Dr. Hruby's office and only through one pharmacy.  *Id.*

Plaintiff returned to Dr. Hruby in mid-July, 2007.  AR 399.  In addition to his low back pain,

---

[11]Lortab is a combination of Hydrocodone and Acetaminophen.  It is indicated for the relief of moderate to moderately severe pain.  Www.rxlist.com.

11

Plaintiff reported increasing depressive symptoms including moodiness, sadness and isolation. *Id.* Dr. Hruby noted a flattened affect, alert and oriented x3, and an "ok mood." *Id.* His diagnosis was chronic low back pain, depression, and hypertension. He advised Plaintiff to engage in a home back care exercise program, use proper lifting and avoid heavy lifting. He urged Plaintiff to consider physical therapy and diagnostic studies if things did not improve. AR 399. Dr. Hruby prescribed Zoloft.

Plaintiff returned to Dr. Hruby on September 28, 2007. AR 408. He reported little relief from his pain medications and no activity due to chronic pain. Dr. Hruby's exam revealed decreased strength in the right lower extremity. *Id.* His diagnosis remained chronic low back pain. He ordered an MRI for the lumbar spine and refilled Plaintiff's pain medications. The MRI report is found at AR 469. The previous surgical procedure was noted. At the L4-5 level the disc bulge mildly encroaches on the left neural foramen. At the L5-S1 level the disc very mildly protrudes centrally and onto the right neural foramen, mildly encroaching the right neural foramen. No significant spinal stenosis was noted at any level. However, the radiologist noted decreased signal on T2 weighted images within the disc at each level from L3 to S1 indicative of disc desiccation. AR 469.

On October 8, 2007, Dr. Hruby arranged for Plaintiff to have a pain injection on October 17. AR 410. When Dr. Hruby's office called Plaintiff to notify him of the appointment, Plaintiff told them he'd lost all his pain medication when he knocked the bottle over while shaving. The nurse agreed to provide a prescription with 30 Hydrocodone pills to last until the epidural injection, but explained the prescription would not be filled again if Plaintiff lost it, dropped it, had it stolen, etc. *Id.*[12] Plaintiff called the office requesting more medication two days before the injection (AR 412). Dr. Hruby agreed to the refill, but spoke with Plaintiff and advised he needed to limit his Lortab[13] to four per day until the injection, planning to decrease after the injection. *Id.*

_____

[12]Plaintiff previously spilled his Percocet prescription into the toilet and requested an early refill. He received a similar admonition from Dr. Fry's staff. AR 294.

[13]Although they are not exactly the same medications, Hydrocodone and Lortab appear interchangeably in Dr. Hruby's medical records.

Plaintiff called Dr. Hruby's office after the epidural injection. AR 414. He explained he got "no relief" from the injection and thought the injection made the pain worse. He requested a refill of his Lortab at four per day. *Id.* Dr. Hruby continued to refill Plaintiff's medications until he next saw Plaintiff in the office in May, 2008. AR 426. During the May visit, Plaintiff explained the pain medications helped but he would like to cut down. Plaintiff had restarted physical therapy. Plaintiff also expressed his belief he may have attention deficit disorder because his son had recently been diagnosed and was doing better on medication. Dr. Hruby refilled Plaintiff's Hydrocodone and Zoloft, and prescribed a trial of Adderall.[14] Plaintiff returned a month later (June 5, 2008) for a follow up visit regarding the ADD diagnosis and prescription. AR 430. He reported better sleep and concentration. *Id.* His chronic back pain was the same although he was losing some weight. Dr. Hruby's physical exam revealed an "ok" range of motion and normal gait. AR 431. His diagnoses were: ADD, depression, hypertension and chronic pain. Dr. Hruby advised Plaintiff to continue therapy with the goal of lowering the use of pain medication. *Id.* On August 4, 2008, Plaintiff called Dr. Hruby's office requesting his Adderall dosage be increased because he did not believe it was working as well. AR 436. Dr. Hruby gave permission to increase the dosage from 15 mg to 20 mg per day. *Id.*

Dr. Hruby continued to refill Plaintiff's medications until December, 2008. In December, Plaintiff requested Dr. Hruby to complete a questionnaire for disability purposes, so Dr. Hruby required Plaintiff to come in for an office visit. AR 446. Dr. Hruby noted Plaintiff's mood was stable on medication and that he suffered no side effects. AR 448. The objective exam revealed mild ankle tenderness but no edema. Dr. Hruby's assessment was: chronic pain, hypertension, depression, ADD, and smoking. *Id.* He agreed to complete the questionnaire and instructed Plaintiff to check his blood pressure at home and follow up as needed. He also encouraged Plaintiff to stop smoking. When Dr. Hruby next saw Plaintiff in March, 2009, he noted worsening mood and chronic pain. Plaintiff was feeling more withdrawn. AR 458. He increased Plaintiff's Zoloft and prescribed

---

[14]Adderall is a single entity amphetamine product indicated for the treatment of attention deficit hyperactivity disorder and narcolepsy. Www.rxlist.com.

Abilify.[15]  Plaintiff discontinued the Abilify in April, 2009 after an adverse reaction.  AR 462.   On April 17, 2009, Dr. Hruby's records contain a note indicating Plaintiff was seen in the emergency room after he'd spent the day doing yard work.  AR 463.  His son took him to the emergency room after Plaintiff's leg buckled and he could not get up.  Plaintiff received a shot, steroids and a muscle relaxant at the emergency room but Plaintiff reported he refused Oxycontin in the emergency room because of his pain agreement with Dr. Hruby.  *Id.*  He requested a refill of his Lortab because he was close to running out.  *Id.*

The medical disability form completed by Dr. Hruby in December, 2008 is found at AR 388-390.  Dr. Hruby opined Plaintiff was capable of lifting 10 pounds occasionally and less than 10 pounds frequently.  He opined Plaintiff could stand and walk less than 2 hours out of an 8 hour work day and sit less than 2 hours out of an 8 hour work day.  AR 388.  He recommended Plaintiff could sit for 15 minutes before changing position and stand 15 minutes before changing position.  *Id.*  Dr. Hruby opined Plaintiff required the ability to shift position at will.  AR 389.  He also opined Plaintiff would require the ability to lie down at unpredictable intervals approximately 4 times per week.  *Id.*  Dr. Hruby cited Plaintiff's disc fusion surgery, bone spurs and arthritis as the medical findings which supported his opinions.  *Id.*  He recommended Plaintiff could "occasionally" twist and climb stairs and "never" stoop, crouch or climb ladders.  *Id.*  He indicated Plaintiff's ability to reach, handle, finger, feel and push/pull were all affected by Plaintiff's pain.  AR 399.  Dr. Hruby explained that Plaintiff should avoid sitting or standing for lengths of time and should avoid bending , twisting or reaching because "most movements aggravate."  AR 390.  He estimated that Plaintiff's condition would cause him to be absent from work more than three times per month.  *Id.*

### 6. Physical Residual Functional Capacity Assessment–Non-Treating, Non-Examining Physician (Dr. Kevin Whittle, MD) (5/08/07)

Dr. Kevin Whittle completed a Physical Residual Capacity Assessment at the request of the

---

[15]Abilify is a psychotropic drug (aripiprazole) that is indicated for the treatment of several disorders including as an adjunctive therapy to antidepressants for the treatment of major depressive disorder.  Www.rxlist.com.

State Agency on May 8, 2007.  Dr. Whittle did not treat or examine the Plaintiff.  It appears Dr. Whittle reviewed the medical records from Plaintiff's orthopedic surgeon in Nevada and his treatment with Dr. Hansen's pain clinic.  AR 334.  It does not appear Dr. Whittle reviewed either the physical therapist (Chad Hanson) or Dr. Hruby's medical records.  Dr. Whittle's primary diagnosis of Plaintiff's medical condition is "DDD" (degenerative disc disease), spinal stenosis in lumbar spine.  He provided no secondary or other alleged impairments.  AR 333.

Dr. Whittle opined Plaintiff is capable of lifting 20 pounds occasionally and 10 pounds frequently.  He opined Plaintiff can stand/walk 6 hours out of an 8 hour work day, and can sit 6 hours out of an 8 hour workday.  AR 334.  He placed no limitations on Plaintiff's ability to push/pull, including operation of hand and foot controls.  *Id.*  Dr. Whittle indicated Plaintiff could climb ramps and stairs and balance frequently, and could climb ladders, ropes and scaffolds, stoop, kneel, crouch and crawl occasionally.  AR 335.  He placed no limitations on reaching, handling, fingering, or feeling.  AR 336.  He assigned no visual, communicative, or environmental limitations. AR 336-37.

As support for his conclusions, Dr. Whittle cited his review of Plaintiff's medical records which revealed the following:  Plaintiff's surgical fusion procedure in December, 2005, after which Plaintiff reported to his surgeon  he was "doing great."  When Plaintiff reported to the plain clinic in South Dakota in April, 2007, he was able to rise from a chair without using his hands.  *Id.*  He limped on the right but that improved as he walked around.  *Id.*  He was able to forward flex and touch his calf and able to heel-toe walk, although he was slightly unstable.  AR 335.  Plaintiff's straight leg raising test was positive for tightness but the Plaintiff reported  benefit from physical therapy.  *Id.*  Dr. Whittle observed the following regarding  the severity of Plaintiff's symptoms and the alleged effect on his function compared with the total medical and non-medical evidence: Plaintiff had the ability to take care of his personal needs, do light housekeeping and drive.  AR 338.  Plaintiff indicated he could only walk one block at a time.  *Id.*  "This appears disproportionate to the clinical findings.  The Claimant's treating pain specialist notes that the claimant has tested positive for THC.  The Dr.'s notes suggest that he suspects some drug-seeking on the part of the claimant.  In any case, the claimant appears to be functioning at light RFC level at present."  *Id.*

7. **Request for Medical Advice–Non-Treating, Non-Examining Physician (Dr. Frederick Entwistle MD) (10/1207)**

Disability Determination Services requested an assessment of Plaintiff's current residual functional capacity when Plaintiff requested review of his initial denial of benefits. AR 353. The file was sent to Dr. Frederick Entwistle on October 11, 2007 for review along with the following note, "54 year old male alleging disability due to back pain. Most recent records attainable list that he went to crazy horse and Mount Rushmore, goals of PT were not to return to working but to be able to hike and fish with his grandson, back pain 4/10, and Piriformis Syndrome Resolving. Could you please adopt RFC if you agree? Thank you." AR 353. The next page consists of a one page form entitled "Case Analysis" dated October 12, 2007. The substance of the form is one typewritten line: "I have reviewed all the evidence in the file, and the assessment of 5-08-07 is affirmed as written." Dr. Entwistle's name is typed in both the spaces provided for his signature and for his printed/typed name. AR 354.

**Hearing Testimony**

Plaintiff, Plaintiff's wife, and a vocational expert (Warren Haagenson)testified at the administrative hearing which was held by video conference on December 22, 2008. Plaintiff was fifty-five years old on the day of the hearing. AR 21. He was married and had two adult children. AR 22. His ten year old grandson lived with him. *Id.* Plaintiff explained he did not babysit his grandson, but played with him "all the time." *Id.* The boy and his mother have lived with them since the child was three months old. AR 22,25. The mother pays rent and buys groceries. AR 25. His wife works full-time at Wal-Mart. *Id.*

At the time of the hearing, Plaintiff was 5'11" and 245 pounds. He'd lost some weight, having weighed 275 pounds at the time he applied for disability benefits. AR 23. He is left-handed. *Id.* He does not use a cane or any other assistive devices. He's a high school graduate and can read and write, but his wife handles the family finances. AR 24. He has not worked since his alleged onset date of December 1, 2005. *Id.* He was working as a school custodian when he "just couldn't do it anymore" and went in for surgery. AR 25. As of the date of the administrative hearing, his sole income consisted of a $705 per month pension from the operator engineer's union. *Id.*

Plaintiff worked for a short time (one season) as a park maintenance worker. AR 26. He worked on and off several times as a heavy equipment operator as a union member. In that capacity he drove dozers, loaders and scrapers—"mostly the big heavy stuff." *Id.* He also delivered appliances for five years. AR 26-27. He was a department head for a retail plumbing store for four years. AR 27. He does not believe he's capable of performing any of his past jobs because his back is in "too bad a shape." AR 28. He cannot stand for long periods of time, can't squat and can't pick up anything. *Id.* He's considered looking for work, but when he works around the house he "just can't." *Id.* He explained he "just can't seem to stay stable long enough to get a job." *Id.*

Plaintiff estimated he's had problems with his low back and right leg dating to the early to mid 1990's. AR 28. It is a constant pain. AR 29. It is a sharp, aching pain. Sometimes it makes his leg numb from his knee to his foot. *Id.* If he engages in activity one day, the next day he is "flat on his back." *Id.* He thought the 2005 surgery would help but it did not. On an average day, his pain level is five or six out of ten. AR 30. That is with his medication. AR 31. If he slips on the stairs or works in the garage, he aggravates the pain. AR 30. Then the pain level raises to an eight. He takes four Vicodin per day. *Id.* The pain management doctor prescribed Oxycodone but that was "terrible" and "took him out." AR 31. Four Vicodin per day does not produce side effects and can control the pain. *Id.*

Plaintiff went through physical therapy after his surgery. AR 31. It helped a little bit. The ALJ asked Plaintiff about a statement he made to the physical therapist[16] about his goals for therapy. AR 32. Plaintiff told the ALJ "that was taken out of context. . . That's why I only seen him for a month. . . Because when he asked me, he said if I could do anything that I wanted to do, if my back was healed, what would it be. And that's what I told him. (By ALJ: Hike and fish with your grandson?). Yeah. And then he asked me, he says well can you work? And I said no, I can't work." AR 32.

---

[16]The notes regarding this comment are contained in *Dr. John Hansen*, not *physical therapist Chad Hanson's* records. AR 342.

17

Plaintiff had an epidural but he believed it made his pain worse. AR 32. He considers Dr. Hruby[17] at Sanford his treating physician. AR 32. Dr. Hruby controls his pain medications. AR 33.[18] When the ALJ asked Plaintiff whether Dr. Hruby had recommended Plaintiff return to see the surgeon who performed Plaintiff's surgery,[19] Plaintiff said, "no, I don't plan on having any more surgery." AR 33.

The ALJ inquired about any other physical problems which might prevent Plaintiff from returning to work. Plaintiff noted he'd been fighting depression for a few years and was taking Zoloft . AR 34. He also considers Dr. Hruby his treating physician for depression. *Id.* He's had ongoing depression since his 2005 surgical procedure but this is the first time his depression has been this severe. *Id.* He has lots of friends who come visit. AR 35. They usually watch TV and talk about old times. He does not belong to any social organizations but he regularly attends church and occasionally his grandson's sports activities. He has no problem getting along with people.

Plaintiff has trouble concentrating when he is in pain. AR 36. It makes him a little edgy. *Id.* He admits he formerly had an alcohol problem but quit drinking in 1994. *Id.* He tested positive for marijuana in May, 2007 when his cousin from California visited and brought some along. AR 48. That is the last time he smoked marijuana. *Id.* Plaintiff disagreed that he exhibited drug-seeking behaviors and voiced his disagreement with Dr. Hansen's philosophies about people who have pain problems. AR 49. Plaintiff insisted he takes his prescribed medication for chronic pain, nothing more. AR 50. He smoked marijuana in 1995 in California, but would not know where to buy it in South Dakota. AR 50. He invited the ALJ to look at his work record as evidence that marijuana

---

[17]The transcriptionist misspelled Dr. Hruby's name in the hearing transcript as "Dr. Ruby." AR 32.

[18]The ALJ asked counsel during the administrative hearing whether Dr. Hruby was the doctor who completed the medical source statement, and counsel answered in the affirmative. AR 33. Counsel appeared to ask the ALJ whether the ALJ had Dr. Hruby's records, but the ALJ did not respond to counsel's inquiry. AR 33.

[19]Plaintiff's 2005 orthopedic surgery occurred in Carson City, Nevada. AR 202-288.

never interfered with his work ethic. AR 50. He worked two jobs to raise his children after his first wife died of cancer at age 32. *Id.*[20]

He has trouble sleeping through the night. He usually only sleeps about three hours per night, until he's so exhausted that every third night he can sleep eight or nine hours. AR 37. He is able to dress and bathe himself, but cannot make the bed or take the garbage out. *Id.* He occasionally helps with cooking, but he does not vacuum. AR 38. He's tried doing yard work and shoveling snow but it "tore him up." *Id.* He does not sweep or wash dishes. He has occasionally done laundry. He occasionally grocery shops and he does walk the dog. AR 38-39. He went fishing five times the year before the administrative hearing. AR 39. He fishes from shore; he tried to fish from a boat but that did not work. AR 40. He can drive 30 or 40 minutes at a time before he has to stop and move around. *Id.* He estimated he can lift no more than 10 pounds without aggravating his back. He estimated he could walk to the park near his home–about a half a block. *Id.* He can stand/sit for 20 minutes and indicated he was very uncomfortable during the hearing. *Id.* His most comfortable position is on his left side. AR 41. He cannot squat or crawl. If he kneels he has a hard time getting up. *Id.* If he has to climb a flight of stairs he takes it part ways, then rests before he climbs the rest. AR 42.

### Elizabeth Houseweart

Elizabeth is Plaintiff's wife. AR 42. She works full-time. AR 43. Her husband gets up in the morning with her and has coffee, then he'll "putz around." AR 44. Sometimes he does the dishes for her, then he rests. He does what he can around the house. He runs errands for her. He does not do anything particularly heavy; he does not vacuum, mop or dust. He keeps up with the dishes. He's up and down all day. AR 44. He's constantly moving around. *Id.* He goes to the store and buys a few groceries and brings them home. *Id.* She does the main grocery shopping on the weekends. AR 45. He watches their ten year old grandson after school. AR 45. Two summers ago

---

[20]The ALJ said "well you indicated to the doctor that you were abusing marijuana in '95 as well." AR 50. Dr. Hansen's note (AR 328) says "The patient smokes one-fourth a pack of cigarettes per day, and has for the past 25 years. He has a history of using marijuana in 1995."

they camped in a cabin at Palisades Park in Garretson. AR 46. In October, 2008, they took a vacation to the Black Hills. *Id.* She did a lot of the driving, but he did some driving. AR 47. They were not in a hurry. He could drive for an hour then they'd stop for coffee or something. *Id.* Her husband loves to fish. He used to go fishing all the time but has not been doing it so much lately. *Id.* She estimated he'd fished three or four times that summer. *Id.* Where they lived before, and before this all happened, he would go out fishing, hiking and hunting a lot "that was his love." AR 48. He does not do too much of that now because he can only do it for a short time–about an hour. *Id.*

### Vocational Testimony

Warren Haagenson testified as a vocational expert (VE). AR 51. He completed a past relevant work summary (AR 196) which indicated Plaintiff's past relevant work consisted of school custodian (DOT Code 382.664-010); Parks Maintenance Worker (DOT Code 249.367-082); Heavy Equipment Operator (DOT Code 859.683-010); Appliance Deliverer (DOT Code 859.683-010); and Retail Department Head-Plumbing (DOT Code 299.137-010). The ALJ asked the VE three hypothetical questions. The ALJ asked the VE to assume an individual who ranged from ages 52-55 during the relevant time frame, with a high school education and some vocational or on-the-job training regarding heavy equipment operation. The ALJ asked the VE to assume the Plaintiff's past relevant work as identified by the VE.[21] He asked the VE whether the Department head job would have any transferrable skills to light work. AR 53. The VE first said "there would be very minimal that could transfer" but then said retail sales stores, which is semi-skilled, light work. AR 53.

The ALJ's first hypothetical asked the VE to assume an individual with the same age, education and past work experience as the Plaintiff. AR 54. He asked the VE to assume the person's physical capabilities as outlined by the non-treating, non-examining DDS physician, Dr. Whittle (light duty). Given that hypothetical, the VE opined Plaintiff would be capable of his past

---

[21]The VE identified Plaintiff's park maintenance job as "light duty" and all other past relevant jobs as "medium duty" except he opined that Plaintiff's heavy equipment operator job was "sedentary" *as it was performed by Plaintiff.* (It is a medium duty job according to the DOT description. *See* AR 196).

relevant work as a parks maintenance worker and as a heavy equipment operator. AR 54. The VE testified Plaintiff would also be capable of working as a sales clerk, DOT Code 290.477-014 AR 53-54.

The ALJ's second hypothetical asked the VE to assume the physical restrictions imposed by Plaintiff's treating physician, Dr. Hruby (less than sedentary duty).[22] AR 55. The VE opined such a person would be unable to sustain competitive employment. *Id.*

The ALJ's third hypothetical asked the VE to assume a person who is able to lift ten pounds occasionally, frequently sit for 6 hours out of an 8 hour workday, stand/walk for 2 hours out of an 8 hour workday, engage in push/pull activities and bilateral lower extremities on a frequent but not constant basis. The person could climb stairs, ramps, ladders, ropes, and scaffolds occasionally and could balance, kneel, stoop, crouch and crawl occasionally. AR 56. Assuming those limitations, the VE opined Plaintiff could return to his job as a heavy equipment operator. *Id.* If this person were required to avoid exposure to vibration because of his back surgery, and to avoid exposure to extreme cold and heat, the job as an equipment operator would no longer be available because it requires exposure to vibration and cold. AR 56.

## DISCUSSION

### A.    Standard of Review

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993) . Substantial evidence is defined as more than a mere scintilla, less than a preponderance, and that which a reasonable mind might accept as adequate to support the Commissioner's conclusion. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Klug v. Weinberger*, 514 F.2d 423, 425 (8th Cir. 1975). "This review is more than a rubber stamp for the [Commissioner's] decision, and is more than a search for the existence

---

[22]The transcriptionist mistakenly referred to Dr. Hruby as Dr. "Goody." AR 55.

of substantial evidence supporting his decision." *Thomas v. Sullivan*, 876 F.2d 666, 669 (8th Cir. 1989) (citations omitted). In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting it. *Woolf*, 3 F.3d at 1213. The Commissioner's decision may not be reversed merely because substantial evidence would have supported an opposite decision. *Id.* If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Commissioner must be affirmed. *Oberst v. Shalala*, 2 F.3d 249, 250 (8th Cir. 1993). "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record." *Mittlestedt v. Apfel*, 204 F.3d 847, 851 (8th Cir. 2000)(citations omitted).

Additionally, when the Appeals Council has considered new and material evidence and declined review, the Court must decide whether the ALJ's decision is supported by substantial evidence in the whole record, including the new evidence. *O'Donnell v. Barnhart*, 318 F.3d 811, 816 (8th Cir. 2003).

The court must also review the decision by the ALJ to determine if an error of law has been committed. *Smith v. Sullivan*, 982 F.2d 308, 311 (8th Cir. 1992); 42 U.S.C. § 405(g). Specifically, a court must evaluate whether the ALJ applied an erroneous legal standard in the disability analysis. Erroneous interpretations of law will be reversed. *Walker v. Apfel*, 141 F.3d 852, 853 (8th Cir. 1998)(citations omitted). The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court. *Smith*, 982 F.2d at 311.

**B.     The Disability Determination and The Five Step Procedure**

Social Security law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do his previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511. The ALJ

applies a five step procedure to decide whether an applicant is disabled. This sequential analysis is mandatory for all SSI and SSD/DIB applications. *Smith v. Shalala*, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R. § 404.1520. When a determination that an applicant is or is not disabled can be made at any step, evaluation under a subsequent step is unnecessary. *Bartlett v. Heckler*, 777 F.2d 1318, 1319 (8th Cir. 1985). The five steps are as follows:

> **Step One:** Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). If the applicant is engaged in substantial gainful activity, he is not disabled and the inquiry ends at this step.

> **Step Two:** Determine whether the applicant has an impairment or combination of impairments that are *severe*, i.e. whether any of the applicant's impairments or combination of impairments significantly limit his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). If there is no such impairment or combination of impairments the applicant is not disabled and the inquiry ends at this step. NOTE: the regulations prescribe a special procedure for analyzing mental impairments to determine whether they are severe. *Browning v. Sullivan*, 958 F.2d 817, 821 (8th Cir. 1992); 20 C.F.R. § 1520a. This special procedure includes completion of a Psychiatric Review Technique Form (PRTF).

> **Step Three:** Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404. 20 C.F.R. § 404.1520(d). If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry. *Bartlett v. Heckler*, 777 F.2d 1318, 1320 at n.2 (8th Cir. 1985). This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work. *Heckler v. Campbell*, 461 U.S. 458, 460, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983). If the applicant's impairment(s) are *severe* but do not meet or equal a *Listed impairment* the ALJ must proceed to step four. NOTE: The "special procedure" for mental impairments also applies to determine whether a severe mental impairment meets or equals a Listing. 20 C.F.R. § 1520a(c)(2).

> **Step Four:** Determine whether the applicant is capable of performing past relevant work (PRW) as defined by 20 CFR 404.1560(b)(1). To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe*) to determine the applicant's residual functional capacity (RFC). If the applicant's RFC allows him to meet the physical and mental demands of his past work, he is not disabled. 20 C.F.R. §§ 404.1520(e); 404.1545(e). If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to Step Five.

> **Step Five:** Determine whether any substantial gainful activity exists in the national

23

economy which the applicant can perform. To make this determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience. 20 C.F.R. § 1520(f).

## C.    Burden of Proof

The Plaintiff bears the burden of proof at Steps One through Four of the Five Step Inquiry. *Barrett v. Shalala*, 38 F.3d 1019, 1024 (8th Cir. 1994); *Mittlestedt v. Apfel*, 204 F.3d 847, 852 (8th Cir. 2000); 20 C.F.R. § 404.1512(a). The burden of proof shifts to the Commissioner at Step Five. "This shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but instead, originates from judicial practices." *Brown v. Apfel*, 192 F.3d 492, 498 (5th Cir. 1999). The burden shifting at Step Five has also been referred to as "not statutory, but . . . a long standing judicial gloss on the Social Security Act." *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987).

## D.    The ALJ's Decision

The ALJ issued an eight page, single-spaced decision on February 6, 2009. AR 9-16. The ALJ's decision discussed steps one through four of the above five-step procedure.

At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity from his alleged onset date (December 1, 2005) through his date last insured (September 30, 2008). AR 11.

At step two, the ALJ found that through his date last insured, the Plaintiff had the following severe impairment: degenerative disc disease. AR 11. The ALJ acknowledged Plaintiff had taken the prescription medication Zoloft for depression, and that Plaintiff had depression, but that Plaintiff's medically determinable mental impairment of depression "did not cause more than minimal limitation on the claimant's ability to perform basic mental work activities and was therefore nonsevere." AR 12.

At step three, the ALJ found "through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Supbart P, ...." AR 13.

At step four, the ALJ found that through the date last insured, Plaintiff had the residual functional capacity to perform the full range of light work with the exception of only occasionally climbing ladders, ropes or scaffolding. AR 13. To reach this determination, the ALJ evaluated Plaintiff's credibility and found his description of his limitations only "partially credible." AR 14. The ALJ agreed that Plaintiff's activities are "likely somewhat limited" by his back condition "however the record reflects more functioning than suggested by the claimant." AR 14. The ALJ cited Plaintiff's one lengthy car trip and his ability to attend church and his grandson's ballgames. The ALJ acknowledged that Plaintiff reported increased pain after activities such as yard work, cleaning the shed, car repairs, and assembling a grill. He also noted, however, that Plaintiff "does a lot of walking his dog." The ALJ again cited Plaintiff's trip to the Black Hills, and took note of Plaintiff's admission that he had gone fishing in the past year. "With this level of activity and travel, it is difficult to find the claimant's reports that he is precluded from all work activity fully credible." AR 14. The ALJ also faulted Plaintiff for not returning to his surgeon ( in Nevada) for further follow-up care. *Id.* The ALJ cited the short duration of Plaintiff's treatment with Dr. Hansen's pain clinic and lack of "further objective testing" and lack of "changes in the claimant's medication or trials of other alternative therapies." *Id.* The ALJ cited Plaintiff's history of steady work as a factor which reflected positively on his credibility, but which was offset by Plaintiff's receipt of $705 per month in a retirement payment. AR 15. "He appears to be content spending time with his grandson. He expressed no motivation to return to work as he began therapy, just a desire to resume activities such as swimming and fishing." *Id.*

The ALJ adopted as "reasonable in light of the evidence of record" the residual functional capacity (light duty) assigned by the non-treating, non-examining physician, Dr. Whittle. AR 14. The ALJ assigned Dr. Hruby's opinion "minimal weight" (AR 15) for three reasons. First, the ALJ indicated the record did not "firmly establish" that Dr. Hruby was Plaintiff's treating doctor because Dr. Hruby's treatment notes had not been submitted to the administrative record. AR 15. Second, the ALJ noted that even assuming Dr. Hruby was the treating physician, "his assessment is not persuasive as he has not supported it by objective medical signs and laboratory findings, rather he bases his findings on the claimant's report and history." *Id.* Third, the ALJ rejected Dr. Hruby's

25

opinion because the assessed limitations are "far in excess of the claimant's reported activities . . .[t]he assessment is not consistent with the record as a whole."

The ALJ did not reach t step five, because he found Plaintiff was capable of returning to his past relevant work as a heavy equipment operator.   As such, the ALJ determined Plaintiff is not "disabled."  AR 15-16.

### E.     The Parties' Positions

The Plaintiff asserts the Commissioner's decision is not supported by substantial evidence. Plaintiff asserts the Commissioner erred in several ways: (1) the Commissioner failed to make a clear finding that Dr. Hruby was Plaintiff's treating physician and therefore give Dr. Hruby's opinion controlling weight; (2) the Commissioner failed to properly resolve inconsistencies in the VE's testimony regarding the DOT job descriptions, which fatally flawed the ALJ's decision that Plaintiff was capable of returning to his past relevant work; (3) the Commissioner failed to properly evaluate Plaintiff's credibility; and (4) the Commissioner failed to properly analyze Plaintiff's mental impairment.

The Commissioner asserts his decision is supported by substantial evidence on the record and should be affirmed.

### F.     Analysis

Plaintiff asserts the ALJ made four mistakes:  (1) improperly evaluating Dr. Hruby's opinion; (2) failing to clarify the vocational testimony; (3) improperly evaluating Plaintiff's credibility; and (4) improperly evaluating Plaintiff's mental impairment.  These assertions will be examined in turn.

#### 1.     The ALJ's Evaluation of the Dr. Hruby's Opinion

The Plaintiff asserts the Commissioner erred by failing to clearly recognize Dr. Hruby as the treating physician, and by failing to give Dr. Hruby's opinion controlling weight.  Dr. Hruby submitted a document entitled "Medical Opinion re: Ability to do Work-Related Activities (Physical)

(AR 388-90) which was acknowledged by the ALJ during the hearing (AR 33). Plaintiff told the ALJ that he saw Dr. Hruby approximately every three months, that he considered Dr. Hruby to be his treating physician, and that it was Dr. Hruby who completed the RFC form. AR 32-33. For reasons which are not clear, however, Dr. Hruby's office notes were not made part of the administrative record until Plaintiff's case was submitted to the Appeals Council. They were not, therefore, available for the ALJ's review nor considered by him in making his decision.

"[A treating physician's opinion is normally accorded a higher degree of deference than that of a consulting physician, but such deference is not always justified. When the treating physician's opinion consists of nothing more than conclusory statements, the opinion is not entitled to greater weight than any other physician's opinion." *Thomas v. Sullivan*, 928 F.2d 255, 259 (8th Cir. 1991). To be entitled to controlling weight, the treating physician's opinion must be well supported by medically acceptable clinical and laboratory diagnostic techniques and not be inconsistent with the other substantial evidence in the record. *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001).[23] When the treating physician's conclusions are based in part on subjective complaints which are properly found to be not credible by the ALJ, the ALJ may reject those conclusions upon which the physician based his findings on the subjective complaints. *Gaddis v. Chater*, 76 F.3d 893, 895 (8th Cir. 1996).

The opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence. "We have stated many times that the results of a one-time medical evaluation do not constitute substantial evidence on which the ALJ can permissibly base his decision." *Cox v. Barnhart*, 345 F.3d 606, 610 (8th Cir. 2003) (citations omitted). "This is especially true when the consultative physician is the only examining doctor to contradict the treating physician." *Id.* Likewise, the testimony of a vocational expert who responds to a hypothetical based

---

[23]Although these cases refer to treating and examining/consulting physicians, the same logic would apply to the weight to be given to the opinions of examining/consulting versus non-examining physicians, which is the situation in this case. See also 20 C.F.R. 404.1527(d) which explains the proper weight to be assigned to all medical opinions contained within the administrative records and the factors to consider when evaluating the appropriate weight to assign to medical opinions whether they be treating, examining, or consulting.

27

on such evidence is not substantial evidence upon which to base a denial of benefits. *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000) (internal citations omitted).  Also, 20 C.F.R. § 404.1527(d) provides the factors to consider  for assigning weight to medical opinions.  That regulation provides:

> (d) How we weigh medical opinions.  Regardless of its source, we will evaluate every medical opinion we receive.  Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
>
> (1) Examining relationship.  Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
>
> (2) Treatment relationship.  Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.  When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(I) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion.  We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.
>
> (I) Length of treatment relationship and frequency of examination.  Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.  When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we give the source's opinion more weight that we would give it if it were from a nontreating source.
>
> (ii) Nature and extent of the treatment relationship.  Generally, the more knowledge a treating source has about your impairment(s)the more weight we will give to the source's medical opinion.  We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories. *****.  When the treating source has reasonable knowledge of your impairment(s) we will give the source's opinion more weight than we would give it if it were from a nontreating source.
>
> (3) Support ability.  The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.  The better an explanation a source provides for an

opinion, the more weight we will give that opinion.  Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all the pertinent evidence in our claim, including opinions of treating and other examining sources.

(4) Consistency. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) Specialization.  We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) Other factors.  When we consider how much weight to give a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion.  For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

On December 18, 2008, Dr. Brad Hruby, Plaintiff's treating physician, opined Plaintiff could sit/stand for fifteen minutes at a time before having to change positions, sit for a total of less than 2 hours out of an 8 hour work day, stand for a total of less than 2 hours out of an 8 hour work day, and carry less than 10 pounds on an occasional basis.  AR 388-90.  The ALJ acknowledged Dr. Hruby's opinion but assigned it "little weight." AR 15.

The ALJ cited three reasons for rejecting Dr. Hruby's opinion:  (1)  the ALJ indicated the record did not "firmly establish" that Dr. Hruby was Plaintiff's treating doctor because Dr. Hruby's treatment notes had not been submitted to the administrative record; (2) the ALJ noted that even assuming Dr. Hruby was the treating physician, "his assessment is not persuasive as he has not supported it by objective medical signs and laboratory findings, rather he bases his findings on the claimant's report and history."; (3) the ALJ rejected Dr. Hruby's opinion because the assessed limitations are "far in excess of the claimant's reported activities . . .[t]he assessment is not consistent with the record as a whole."

The ALJ must "always give good reasons" for the weight afforded to a treating physician's

evaluation. *Reed v. Barnhart*, 399 F.3d 917, 921 (8th Cir. 2005). Conclusory reasons for rejecting the treating physician's opinion, however, are insufficient. *Id.* The ALJ may reject a treating physician's opinions outright "only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation, or lay opinion." *McGoffin v. Barnhart*, 288 F.3d 1248, 1251 (10th Cir. 2002).

The ALJ's reasons for rejecting Hruby's opinions in this case are conclusory. The ALJ had a duty to recontact the treating physician for clarification of his opinion, if any clarification was necessary. *Bowman v. Barnhart*, 310 F.3d 1080, 1085 (8th Cir. 2002) (ALJ obligated to contact treating physician for "additional evidence or clarification."); 20 C.F.R. § 404.1512(e) (explaining that when the information received from a treating physician is inadequate, the Commissioner will recontact for clarification). The ALJ's first reason for rejecting Dr. Hruby's opinion was that he (the ALJ) was not entirely sure that Dr. Hruby was indeed the treating physician because no treatment notes had been provided. During the administrative hearing, the ALJ was made fully aware by the Plaintiff that Dr. Hruby was Plaintiff's treating physician and that it was Dr. Hruby who provided the RFC form which was on file. In his written decision, the ALJ noted the absence of Dr. Hruby's records and cited the same as a reason to reject Dr. Hruby's opinion, yet the ALJ ignored his *own* duty to contact the treating physician to obtain the records. *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000) ("It is . . well settled law that it is the duty of the ALJ to fully and fairly develop the record even when . . .the claimant is represented by counsel.").

The second reason the ALJ gave for rejecting Dr. Hruby's opinion is intertwined with the first: that it was not supported by objective medical signs, but only by Plaintiff's own report and history. This finding is technically correct as to the information which was before the ALJ, but it was compounded by the ALJ's own error in failing to obtain Dr. Hruby's medical records. The Appeals Council, however, was provided with a copy of Dr. Hruby's records (AR 5). The Appeals Council nevertheless rejected Dr. Hruby's opinion because his *signature was illegible* and "the evidence form (sic) the Sanford Clinic would not warrant any corrective action." AR 2. The Appeals Council noted Dr. Hruby's notes consisted mainly of Plaintiff's requests for medication refills. *Id.* This statement

fails to acknowledge that Plaintiff was receiving physical therapy from a separate provider (Chad Hanson) who provided Dr. Hruby with periodic update reports as to Plaintiff's physical condition and progress. AR 370, 381.   It also fails to acknowledge the following findings in Dr. Hruby's records:

- 11/16/06 (AR 474) decreased range of motion in the trunk, referral to the pain clinic
- 7/17/07 (AR 399) appears to be in mild to moderate pain, antalgic gait noted, flattened affect
- 9/30/07 (AR 408) decreased strength right lower extremity, MRI ordered
- 10/5/07 (AR 468-69) MRI shows multiple finding of disc disease and degenerative changes, post operative fibrosis and disc space narrowing. The MRI also showed decreased signal on T2 weighted images within the disc at each level from L3 to S1 indicative of disc desiccation.

The ALJ's third reason for dismissing Dr. Hruby's opinion was that the restrictions assigned by Dr. Hruby were "far in excess of the activities reported" by the Plaintiff. The ALJ did not specify which activities were far in excess of Dr. Hruby's restrictions, but the activities cited by the ALJ in support of his unfavorable credibility finding were:

- he has taken at least one lengthy car trip[24]
- he attends church and his grandson's ballgames
- he does "a lot" of walking his dog[25]
- He goes camping[26], fishing[27] and road hunting[28]
- He took a trip to the Black Hills

The ALJ  acknowledged that Plaintiff told his therapist that his pain increased after  he tried to do yard work, clean out his shed, do car repairs, or assemble a grill.   The limitations imposed by Dr. Hruby's RFC, when viewed in context with the **complete** record, are not "far in excess of

---

[24]Plaintiff has his wife both testified that Plaintiff can drive for 40 minutes to an hour before he needs to stop and move around.  AR 40,47.

[25]Plaintiff testified he walked his dog twice a week for fifteen minutes at a time before the weather got bad. AR 39.

[26]Plaintiff's wife testified they camped once, two years ago in the cabins at Palisades Park in Garretson.  AR 46.

[27]Plaintiff and his wife testified Plaintiff loves to fish but cannot do it as much as he would like.  He fished about five times from the shore in the past year, for about an hour at a time.  AR 39, 47-48.

[28]Plaintiff testified he tried road hunting once, but it did not work.  AR 39.

claimant's reported activities."   The Eighth Circuit has noted many times that  "An SSI Claimant need not prove that she is bedridden or completely helpless to be found disabled and the fact that claimant cooks and cleans for herself, shops for groceries, does laundry, visits friends, attends church, and goes fishing does not in and of itself constitute substantial evidence that a claimant possesses the residual functional capacity to engage in substantial gainful activity." *Thomas v. Sullivan*, 876 F.2d 666, 669 (8th Cir. 1989).

The ALJ's assignment of "little weight" to the opinion of Plaintiff's treating physician, while assigning "great weight" to the opinion of a non-examining, non-treating physician is not supported by substantial evidence in the record as a whole.

## 2.      The ALJ's Evaluation of the VE's Testimony

The ALJ found Plaintiff is capable of returning to his past relevant work as a heavy equipment operator and parks maintenance worker (AR 15).  To make this determination, the ALJ relied on the testimony of the VE who acknowledged that although a heavy equipment operator is normally classified as "medium duty" according to the DOT definition, Plaintiff previously performed this job at the "sedentary" level.[29]  The VE explained that Plaintiff's previous work as a parks maintenance worker is classified as a light duty job according to the DOT definition, and is therefore within Plaintiff's RFC.  Finally, the VE testified that Plaintiff's job as a plumbing department manager provided him with transferable skills which would allow him to work in retail sales–also a light duty position.[30]

---

[29]Although this conclusion is never explicitly explained in the record by the ALJ or the VE, it is apparently reached by the answers provided by Plaintiff on the form he completed (AR 166) during the disability application process, in which indicated that his job as a heavy equipment operator did not require lifting or carrying.

[30]Plaintiff's independent  VE report to the Appeals Council (AR 137-39) addressed the Step Four  past relevant work issue (heavy equipment operator and park maintenance worker jobs), but did not address the Step Five inquiry (retail sales position).  The Appeals Council did not address the past relevant work issue in its decision affirming the ALJ.  AR 2.  The Appeals Council only addressed the VE's hearing statement that Plaintiff had skills which would transfer to a retail sales job, a  Step Five inquiry upon which the ALJ did not explicitly rely because his

The report of Mr. Tom Audet, the vocational expert retained by the Plaintiff, has been carefully reviewed.  For ease of reference, the DOT occupational title descriptions for the following occupations at issue in this case–referenced by Mr. Audet's report (AR 137-39) and by Warren Haagenson, the administrative hearing VE (AR 196), are attached to this Report and Recommendation:

- heavy equipment operator (operating engineer), DOT Code 859.683-010

- landscape specialist, DOT Code 406.687-010

- park aide, DOT Code 249.367.082

The VE assumed that although normally classified as medium duty work, as described by Plaintiff he has previously performed the heavy equipment operator job at the sedentary level.  AR 52-53, 196.  This assumption is not based on anything Plaintiff said during the hearing because the only question Plaintiff was asked about the heavy equipment operator job during the hearing was what type of equipment he drove.  AR 26.  In his paperwork, however, he indicated this job did not require any lifting or carrying.  AR 166.  Mr. Audet explained:

> One can see from the definition of medium work that lifting or carrying may be one aspect of why a job may be considered medium work but exerting forces also involves pushing or pulling.  If the pushing and pulling activities involve exerting up to 10 pounds of force constantly, the work is classified as medium work.  Heavy equipment operators also work in construction environments and as a rehabilitation consultant, I have worked with many heavy equipment operators over the years who have had back problems and these workers often indicate that operating heavy equipment is rough and there is considerable bouncing around which can cause significant back pain. . . . The bottom line is that even though Gary did not have to do any significant lifting, he did have to exert forces on foot controls and hand controls to operate heavy equipment and therefore by my estimation he was not doing sedentary work or even

_____

decision rested on his determination that Plaintiff is capable of his past relevant work.  *See Bartlett v. Hecker*, 777 F.2d 1318, 1319 ("When a determination is made that an individual is or is not disabled can be made at any step, evaluation under a subsequent step is unnecessary.  Only if the final stage is reached does the fact finder consider the claimant's age, education and work experience in light of his or her residual functional capacity.").  *See also*, 20 C.F.R. § 404.1520 (a)(4): "the sequential evaluation process is a series of five 'steps' that *we follow in a set order. If we can find that you are disabled or not disabled at a step, we make our determination or decision and **we do not go on to the next step**. . . .*" (Emphasis added).  Because the ALJ determined Plaintiff is capable of past relevant work at Step Four, the Step Five inquiry is not addressed in this Report and Recommendation.

light work.

AR 138.

Mr. Audet also compared Plaintiff's hearing testimony regarding his park maintenance job to the DOT Code for the corresponding job identified by the VE (park aide). The park aide DOT job description is not an accurate description of Plaintiff's past work mowing park lawns with a 16 foot mower. The park aide job identified by the VE as defined by DOT Code 249.367-082 is a light duty job including duties such as: greeting visitors, assigning camp sites, collecting fees, conducting tours, operating projection and sound equipment for interpretive programs, providing simple first aid to visitors, participating in conservation activities, and preservation of artifacts when stationed at an archeological site.

Audet identified as more appropriate the DOT Code 406.687-010 (landscape specialist) which is a medium duty job. Duties included in that job description are: Maintains grounds and areas along highway right-of-way, state and national parks . . mows lawns using hand mower or power driven mower. This medium duty DOT Code more accurately describes Plaintiff's past relevant work.

The ALJ concluded  Plaintiff could return to his past relevant work as a heavy equipment operator which the DOT classifies at medium duty. The ALJ assumed Plaintiff previously performed the heavy equipment operator job at a sedentary level because he indicated the job as he performed it did not require lifting.    That plaintiff did not lift or carry when he worked as a heavy equipment operator did not render the job sedentary, because  a heavy equipment operator's job is defined by the DOT as medium duty not by what he lifts or carries but by the force he exerts through the handwheels and pedals on the equipment he operates.   "An ALJ cannot rely on expert testimony that conflicts with the job classifications in the DOT unless there is evidence in the record to rebut those classifications." *Jones v. Barnhart*, 315 F.3d 974, 979 (8th Cir. 2003).  There was no such evidence in this record. The same is true for the VE and the ALJ's determination that Plaintiff's past relevant work should be classified as a park aide rather than a landscape specialist. The park aide DOT Code, while consistent with the light duty RFC assigned by the ALJ, is not consistent with the actual

34

previous work the Plaintiff described.   The landscape specialist DOT Code job description better matches the actual work previously performed by the Plaintiff, but it is a medium duty job and does not fit within the light duty RFC.

The ALJ's conclusion  that Plaintiff can return to his past relevant work because it is consistent with his light duty RFC is not supported by substantial evidence on the record as a whole.

### 3.     The Credibility Determination

At the fourth step, the ALJ disregarded portions of the Plaintiff's testimony regarding his physical abilities and his subjective pain complaints.  The ALJ accepted opinion of the vocational expert which included the limitations described by the State Agency  medical consultants.

Plaintiff's third assignment of error is that the ALJ did not appropriately apply the *Polaski* factors to evaluate Plaintiff's subjective complaints when determining his residual functional capacity. "Where adequately explained and supported, credibility findings are for the ALJ to make." *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000).  If the ALJ's credibility determination is supported by substantial evidence, that the reviewing judge  may have decided differently is not justification for reversal. *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004).  The ALJ's credibility finding must only be supported by "minimally articulate reasons for crediting or rejecting evidence of disability" *Id.*   This analysis must begin with the principle that the court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).

Ordinarily, credibility determinations are peculiarly for the finder of fact. *Kepler v. Chater*, 68 F.3d 387, 391 (8th Cir. 1995).  Findings as to credibility, however, should be closely and affirmatively linked to substantial evidence and "not just a conclusion in the guise of findings." *Id.* The ALJ must articulate specific reasons for questioning the claimant's credibility where subjective pain is a critical issue. *Id.*   Thus, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the Plaintiff's complaints. *Masterson v.*

*Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004).

When evaluating evidence of pain, the ALJ must consider: (1) the claimant's daily activities; (2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain; (3) any precipitating or aggravating factors; (4) the dosage, effectiveness and side effects of any medication; and (5) the claimant's functional restrictions. *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004) *citing Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). *See also* 20 C.F.R. § 1529. The ALJ may not reject a claimant's subjective pain complaints solely because the objective medical evidence does not fully support them. *Polaski* at 1320.   The absence of objective evidence is merely one factor to consider. *Id.*

When a Plaintiff claims the ALJ failed to properly consider his subjective pain complaints, the duty of the Court is to ascertain whether the ALJ considered *all* of the evidence relevant to the Plaintiff's complaints of pain under the *Polaski* standards and whether the evidence so contradicts the plaintiff's subjective complaints that the ALJ could discount his testimony as not credible. *Masterson*, 363 F.3d at 738-39 (emphasis added).   It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered all the evidence. *Id.*

The ALJ did not cite *Polaski* but he did mention 20 C.F.R. § 404.1529  and indicated he had considered those factors. *See* AR 13.   The task for the Court, therefore, is to determine whether the ALJ properly considered all the record evidence when he determined Plaintiff's pain complaints "are not credible to the extent they are inconsistent with [a light duty] residual functional capacity assessment" AR 15.

The ALJ did not specifically mention *Polaski* or elaborate at all upon 20 C.F.R. § 404.1529 in making his credibility determination.   "Although specific delineations of credibility findings are preferable, an ALJ's arguable deficiency in opinion-writing technique does not require [the Court] to set aside a finding that is supported by substantial evidence." *Carlson v. Chater,* 74 F.3d 869, 871 (8th Cir. 1996).   Substantial evidence is defined as more than a mere scintilla, less than a

36

preponderance, and that which a reasonable mind might accept as adequate to support the Commissioner's conclusion. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Klug v. Weinberger*, 514 F.2d 423, 425 (8th Cir. 1975).

This court is extremely hesitant to disturb an ALJ's credibility finding. In this instance, however, the credibility finding was based in large part upon the ALJ's determination that the Plaintiff's testimony was "not supported by the medical evidence of record.*" See, e.g.* AR 14 ("the record does not reflect further objective testing . . the record does not reflect changes in the claimant's medication or trials of other alternative therapies.") Dr. Hruby's records, had they been a part of the record before the ALJ, would have revealed many changes in medications and further objective testing (the 2007 MRI). The internal inconsistencies of the level of Plaintiff's functioning as recited by the ALJ have already been discussed on page 31 of this Report and Recommendation. Because it does not appear the ALJ considered *all* the evidence, the credibility determination should be reconsidered on remand.

### 4.    The ALJ's Evaluation of Plaintiff's Mental Impairment

Plaintiff's final assignment of error is that the ALJ improperly failed to obtain an evaluation of Plaintiff's mental impairment (depression). The Plaintiff refers to the mandatory "special procedure" for mental impairments which is briefly described on page 23 of this Report and Recommendation.

The ALJ discussed Plaintiff's depression at AR 12. The ALJ acknowledged Plaintiff's doctor prescribed Zoloft "for the last couple of years." *Id.* The ALJ indicated, however, that "the treatment notes do not reflect the use of Zoloft" and that Plaintiff had not sought out treatment from a counselor, psychologist, or psychiatrist. *Id.* Plaintiff testified he considered Dr. Hruby his treating physician for the depression problems. AR 34. At the beginning of his pain management program with Dr. Hansen, Plaintiff was resistant to psychological counseling. The ALJ found "giving some credit to claimant's testimony, the undersigned finds the claimant has depression, however the claimant's medically determinable mental impairment of depression did not cause more than minimal limitation

in the claimant's ability to perform basic mental work activities and was therefore nonsevere." AR
12. The ALJ determined Plaintiff's depression caused only "mild" limitations on his activities of
daily living, social functioning, maintaining concentration, persistence and pace, and that Plaintiff had
suffered no episodes of decompensation. *Id.* The evaluation of Social Security disability applicants'
mental impairments is governed by statute and regulation. 42 U.S.C. § 421(h) provides:

> **(h) Evaluation of mental impairments by qualified medical professionals**
> An initial determination under subsection (a), (c), (g), or (I) of this section that an
> individual is not under a disability, in any case where there is evidence which
> indicates the existence of a mental impairment, shall be made only if the
> Commissioner of Social Security has made every reasonable effort to ensure that a
> qualified psychiatrist or psychologist has completed the medical portion of the case
> review and any applicable residual functional capacity assessment.

The applicable regulation is found at 20 CFR § 404.1520a. Section(e) of that regulation
provides:

> (e) Documenting application of the technique. At the initial and reconsideration levels
> of the administrative review process, we will complete a standard document to record
> how we applied the technique. At the administrative law judge hearing and Appeals
> Council levels (in cases in which the Appeals Council issues a decision) and the
> Federal reviewing official, administrative law judge, and the decision review board
> level in claims adjudicated under part 405 of this chapter, we will document
> application of the technique in the decision.

The Eighth Circuit has interpreted the combination of the statute and the regulation to mean that

> although the administrative law judge is authorized under the regulations to complete
> the PRTF himself [pursuant to the regulation] the statute declares that in any case
> where there is evidence which indicates the existence of a mental impairment, an
> administrative law judge may *not* make an initial determination that the claimant is
> not disabled unless the administrative law judge had made every reasonable effort to
> ensure that a qualified psychiatrist or psychologist has completed the medical portion
> of the case review and applicable residual functional capacity assessment. *See* 42
> U.S.C. § 421(h); *see also Andrade v. Secretary of Health ad Human Services*, 985
> F.2d 1045, 1049 (10th Cir. 1993)(reversing because administrative law judge did not
> ask a psychiatrist or psychologist to complete the PRTF).

*Montgomery v. Shalala*, 30 F.3d 98, 101 (8th Cir. 1994)(emphasis in original). The statute, 42
U.S.C. §421(h) applies in this instance because there had been no determination about Plaintiff's
mental impairment at the agency level. The ALJ made the initial disability determination regarding
the mental impairment. There is no evidence that the ALJ made "every reasonable effort" to ensure

38

that a qualified psychologist or psychiatrist completed the medical portion of the case review and applicable residual functional capacity assessment. A reasonable effort should be made on remand.

## CONCLUSION

It is respectfully recommended that the Plaintiff's Motion for Summary Judgment (Doc. 9) be GRANTED, and that the Commissioner's denial of benefits be REVERSED and REMANDED for reconsideration.

For the reasons discussed above, the Commissioner's denial of benefits is not supported by substantial evidence in the record. The Plaintiff requests reversal of the Commissioner's decision with remand and instructions for an award of benefits, or in the alternative reversal with remand and instructions to reconsider his case.

42 U.S.C. § 405(g) governs judicial review of final decisions made by the Commissioner of the Social Security Administration. It authorizes two types of remand orders: (1) sentence four remands and (2) sentence six remands. A sentence four remand authorizes the court to enter a judgment "affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A sentence four remand is proper when the district court makes a substantive ruling regarding the correctness of the Commissioner's decision and remands the case in accordance with such ruling. *Buckner v. Apfel*, 213 F.3d 1006, 1010 (8th Cir. 2000). A sentence six remand is authorized in only two situations: (1) where the Commissioner requests remand before answering the Complaint; and (2) where new and material evidence is presented that for good cause was not presented during the administrative proceedings. *Id.* Neither sentence six situation applies here.

A sentence four remand is applicable in this case. Remand with instructions to award benefits is appropriate "only if the record overwhelmingly supports such a finding." *Buckner*, 213 F.3d at 1011. In the face of a finding of an improper denial of benefits, but the absence of overwhelming evidence to support a disability finding by the Court, out of proper deference to the ALJ the proper

course is to remand for further administrative findings. *Id., Cox v. Apfel*, 160 F.3d 1203, 1210 (8th Cir. 1998).

In this case, reversal and remand is warranted not because the evidence is overwhelming, but because the record evidence should be clarified and properly evaluated. *See also Taylor v. Barnhart*, 425 F.3d 345, 356 (7th Cir. 2005) (an award of benefits by the court is appropriate only if all factual issues have been resolved and the record supports a finding of disability). Therefore, a remand for further administrative proceedings is appropriate. It is respectfully RECOMMENDED to the District Court, therefore, that the Commissioner's decision be REVERSED and REMANDED for reconsideration pursuant to 42 U.S.C. § 405(g), sentence four.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court.

*Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).
*Nash v. Black*, 781 F.2d 665 (8th Cir. 1986).

Dated this ___7___ day of March, 2010.

BY THE COURT:

_____
John E. Simko
United States Magistrate Judge

ATTEST:
JOSEPH HAAS, Clerk

40

By *Colleen Schulte* , Deputy